# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRITTANY MORRISON, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>YIPPEE ENTERTAINMENT, INC.,<br><br>Defendant. | Case No. 24-cv-0797-MMA-KSC<br><br>**ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>[Doc. No. 13] |

Defendant Yippee Entertainment, Inc. ("Defendant" or "Yippee") filed the instant motion to compel arbitration on July 17, 2024. Doc No. 13.[1] Plaintiff filed a response in opposition, to which Defendant replied. Doc. Nos. 16–17. The Court found this matter suitable for determination on the papers and without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7.1.d.1. *See* Doc. No. 19. For the reasons set forth below, the Court **DENIES** Defendant's motion to compel arbitration.

---

[1] All citations to electronically filed documents refer to the pagination assigned by the CM/ECF system.

# I. Background

Defendant is a corporation that operates Yippee TV—a faith-based video streaming service accessible through either a web browser or mobile application. Doc. No 1. ("Compl.") ¶¶ 4, 9, 18. To access Yippee TV, users are required to purchase a subscription at either $8.00 per month or $49.00 per year. *Id.* ¶ 22. Plaintiff is one such user, who created an account and purchased a subscription to Yippee TV from her web browser in or around September 2023. *Id.* ¶ 61.

Defendant utilizes an "application programming interface ('API')" on its website and app, Segment API, which "collect[s] and connect[s] data from other tools and aggregat[es] the data to monitor performance, inform decision-making processes, and create uniquely customized user experiences." *Id.* ¶ 33. "Defendant utilizes each and every one of these features of the Segment API in the [a]pp and sends their consumers' [personally identifiable information ("PII")] to Twilio," a "customer engagement platform" that owns and operates Segment API, when a user views a video through Defendant's service. *Id.* ¶¶ 28, 30, 32, 34. This PII includes "(i) a user's full name (ii) a user's email address; (iii) a user's Segment ID; (iv) the video ID for the specific video viewed by the user; and (vi) the video title." *Id.* ¶ 30. Defendant thus, according to Plaintiff, "intentionally and knowingly" discloses PII to Twilio. *Id.* ¶ 44.

With this PII, Twilio uses Segment API to "analyze [a]pp data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendant's revenue from its marketing campaigns." *Id.* ¶ 48. This includes creating "'unified customer profiles' by 'tak[ing] event data from across devices and channels and intelligently merg[ing] it into complete user- or account-level profiles.'" *Id.* ¶ 49. Defendant also discloses users' PII to Twilio so it can better target marketing campaigns. *Id.* ¶ 54. After Defendant discloses users' PII, Twilio compiles and transmits that information to other third parties that Defendant utilizes for targeted advertising." *Id.* ¶ 56.

Here, with her subscription, Plaintiff used a web browser to regularly play Defendant's pre-recorded videos for herself and her children between around September

2023 until February 2024. *Id.* ¶¶ 61–2. During that period, she alleges, "each time [she] accessed a video . . . Defendant disclosed her PII to Twilio via the Segment API." *Id.* ¶ 65. "Using this information, Twilio was able to identify Plaintiff [] and attribute her video viewing records to an individualized profile of [her] in its databases." *Id.* ¶ 66. Plaintiff, however, never authorized Defendant to disclose her PII. *Id.* ¶ 63. In March 2024, Plaintiff's counsel retained a "private research company" to conduct a "dynamic analysis" of Defendant's app, which records transmissions that occur from a user's device. *Id.* ¶¶ 24. Through that company, Plaintiff's counsel became aware that Defendant disclosed the described information to a third party through Segment API. *Id.* ¶¶ 25–26. As a result, Plaintiff alleges a single cause of action for violation of the Video Privacy Protection Act, 18 U.S.C. § 2710. *Id.* ¶¶ 74–82.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States District Court . . . for an order directing that . . . arbitration proceed in the manner provided for in [the arbitration] agreement." 9 U.S.C. § 4. Upon a showing that a party has failed to comply with a valid arbitration agreement, the district court must issue an order compelling arbitration. *Id.* The Supreme Court has stated that the FAA espouses a general policy favoring arbitration agreements. *AT & T Mobility v. Concepcion*, 563 U.S. 333, 339 (2011). Federal courts are required to rigorously enforce an agreement to arbitrate. *See id.* Courts are also directed to resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476–77 (1989).

In determining whether to compel a party to arbitrate, the Court may not review the merits of the dispute; rather, the Court's role under the FAA is limited "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (internal quotation marks and citation omitted). If the Court finds that the

answers to those questions are "yes," the Court must compel arbitration. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). If there is a genuine dispute of material fact as to any of these queries, a district court should apply a "standard similar to the summary judgment standard of [Federal Rule of Civil Procedure 56]." *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004).

Agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Courts must apply ordinary state law principles in determining whether to invalidate an agreement to arbitrate. *Ferguson v. Countrywide Credit Indus.*, 298 F.3d 778, 782 (9th Cir. 2002). As such, arbitration agreements may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability. *Concepcion*, 563 U.S. at 339–41.

### III. DISCUSSION

Here, all contentions between the parties are premised on one issue: whether, when Plaintiff subscribed to Yippee TV, she agreed to the Vimeo OTT Viewer Terms of Service ("Vimeo Terms of Service") such that she is bound by its terms. Doc. No. 13-1 at 7; Doc. No. 16 at 8. These terms, according to Defendant, contain a mandatory arbitration clause. Doc. No. 13-1 at 11.

"In determining whether a valid arbitration agreement exists, federal courts "apply ordinary state-law principles that govern the formation of contracts." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). An enforceable agreement requires that parties to it "manifest mutual assent" to its terms. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) (analyzing California and New York law). A party may manifest their assent, including to an online agreement, through conduct rather than express written or oral consent. *Id.* at 855–56

The parties here agree that California contract law applies to the Court's analysis. Doc. No. 13-1 at 13 n.4; Doc. No. 16 at 10. The parties also agree as to the webpage's

appearance. When subscribing to Yippee TV as Plaintiff did, potential subscribers are directed to a webpage on which they are prompted to enter their payment information and click a button labeled "Start Subscription." Doc. No. 13-2 at 19; Doc. No. 16-1 at 4. The page contains a hyperlink to Vimeo's Terms and Conditions, titled "Terms of Service" in a paragraph of text above the "Start Subscription" button. *Id.*



Doc No. 13-2 at 19 ("Def. Fig. B"); *see also* Doc. No. 16-1 at 4 ("Pl. Fig. A").

The parties contest whether, by clicking the "Start Subscription" button, Plaintiff assented to the Vimeo Terms of Service. The scheme for assessing mutual assent to online terms and services agreements is complex and often hinges on a webpage's format, which come in various types. A "browsewrap" agreement, for example, is one in which "a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id.* at 846. A "clickwrap" agreement, by contrast, is one in which "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating, 'I agree' in order to proceed." *Id.* Recently, the Ninth Circuit and California state courts have come to recognize certain "hybrid" agreements involving elements of both browsewrap and clickwrap. This includes "sign-in wrap" agreements, which contain a "Terms and Conditions" (or similar) hyperlink preceded or followed by statements informing consumers that by completing their purchase, creating an account, clicking a button, or taking some other action, they accept the terms linked. *See, e.g. Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 16–32 (Cal. Ct. App. 2021); *Maynez v. Walmart, Inc.*, 479 F. Supp. 3d 890, 897 (C.D. Cal. 2020); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) (analyzing California and Massachusetts law).

The Yippee TV subscription page contains a hyperlink placed above the "Start Subscription" button, preceded by the phrase "[b]y clicking below, you agree to our Terms of Service . . . ." Def. Fig. B; Pl. Fig. A. This characteristic is the hallmark of a sign-in wrap agreement. *See Sellers*, 289 Cal. Rptr. 3d at 21. Thus, the Court determines that the Yippee agreement is a sign-in wrap agreement.

When analyzing sign-in wrap agreements that fall somewhere between browsewrap, which courts are reluctant to enforce, and clickwrap, which courts routinely enforce, a court must "analyze mutual assent under an objective-reasonableness standard." *Oberstein*, 60 F.4th at 513. This includes whether, through the hyperlinked terms, a webpage provides consumers "reasonably conspicuous notice" of the terms and conditions. *Berman*, 30 F.4th at 856–58. Courts employ a variety of criteria by which

they assess whether a website provides reasonably conspicuous notice of terms, including hyperlink font size, color, prominence within the webpage, obviousness, and other indicators that "ensure that [the hyperlink] is sufficiently 'set apart' from the surrounding text." *Id.*; *see also Cavanaugh v. Fanatics, LLC*, No. 1:22-CV-01085 JLT SAB, --- F. Supp. 3d ---- 2024 WL 3202567 at *5 (E.D. Cal. Jun. 26, 2024).

The Court must also, however, consider the context of a transaction, to determine whether a user would, under the circumstances, "contemplate[] some sort of continuing relationship" that would make them more likely to scrutinize the page for contractual terms. *Oberstein*, 60 F.4th at 516 (citing *Sellers*, 289 Cal. Rptr. 3d at 29); *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1020 (9th Cir. 2024). In transactions which contemplate a continuing relationship, courts are more inclined to enforce hyperlinked agreements. *See id.* at 1020; *B.D. v. Blizzard Ent., Inc.*, 292 Cal. Rptr. 3d 47, 64 (Cal. Ct. App. 2022).

First, the Court finds that the context of Plaintiff's subscription purchase would lead a consumer to contemplate at least some limited form of ongoing relationship. Defendant provides "faith-based" shows on a subscription basis. Compl. ¶¶ 18, 22. These subscriptions are offered in increments of one month or one year. *Id.* ¶ 22. This subscription-based model implies that a user must act to renew their subscription to continue their use when their original subscription expires (or, in the case of automatic renewal, to cancel their subscription when no longer wanted), and thus represents a more continuing, interactive, relationship than making a one-time purchase. *Keebaugh*, 100 F.4th at 1020; *Blizzard Ent., Inc.*, 292 Cal. Rptr. 3d. at 61–2. Likewise, one would expect to have, and exercise, ongoing access to Defendant's content via its app or webpage throughout the subscription period. *See Keebaugh*, 100 F.4th at 1020; *Blizzard Ent., Inc.*, 292 Cal. Rptr. 3d 47, 61–2 (Cal. Ct. App. 2022); *see also Ghazizadeh v. Coursera, Inc.*, --- F. Supp. 3d ---- No. 23-CV-05646-EJD, 2024 WL 3455255 at *5–10 (N.D. Cal. Jun. 20, 2024) (analyzing a similar platform offering access to online classes). However, this relationship is not necessarily akin to creating an account or profile in which one will

make subsequent, subsidiary purchases or transactions during use, like a video game or app with in-game purchases.  *See, e.g.*, *Keebaugh*, 100 F.4th at 1020; *Blizzard Ent., Inc.*, 292 Cal. Rptr. 3d at 52, 61–65.  Additionally, the Court notes the similarity between Defendant's subscription model and the subscription service in *Sellers v. JustAnswer, LLC* to a referral site for medical professionals.  *See Sellers*, 289 Cal. Rptr. 3d at 6.  Therefore, the Court finds that a consumer would anticipate at least a limited ongoing relationship based upon their subscription.  This weighs in favor of finding Defendant's sign-in wrap agreement enforceable.

However, the Court must still analyze the hyperlink's visual placement to determine whether it is sufficiently conspicuous to put a "reasonably prudent" user on notice.  *Keebaugh*, 100 F.4th at 1019; *Oberstein*, 60 F.4th 516 (quoting *Berman*, 30 F.4th at 857).  Ultimately, the Court concludes that Defendant did not provide Plaintiff with sufficient notice.  While the "Terms of Service" hyperlink appears in blue font against a white background—a characteristic to which many courts look—the font is not underlined nor completely capitalized and is small in proportion to most of the text on the page.  *See Berman*, 30 F.4th at 857; *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019).  Likewise, the "Terms of Service" hyperlink comes in a sequence of three hyperlinks (albeit separated by black-font commas), and it is not immediately clear whether these lead to different, or the same, webpages.  Further, though located near the "Start Subscription" button, it is within an eight-line paragraph, all in font smaller than that on the page generally.  *See Burzdak v. Universal Screen Arts, Inc.*, No. 21-CV-02148-EMC, 2021 WL 3621830 at *6 (N.D. Cal. Aug. 16, 2021) (comparing cases); *Sadlock v. Walt Disney Co.*, No. 22-CV-09155-EMC, 2023 WL 4869245 at *10 (N.D. Cal. Jul. 31, 2023).  Additionally, the page contains promotional material displaying emoticon illustrations and self-promotional statements, which draw a viewer's attention away from the hyperlink.  *Id.*  Finally, this webpage contains a second hyperlink labeled "Terms of Service" below the "Start Subscription" button.  Def. Fig. B; Pl. Fig. A.  While the text above this hyperlink informs the user that it redirects them to Google's terms of

service—which apparently also apply—a second hyperlink with the same name and similar placement as the one in question only further draws the viewer's attention and may cause confusion. *Cf. Colgate*, 402 F. Supp. 3d at 765. These features weigh against a finding that the webpage adequately put Plaintiff on notice.

Similar recent cases are instructive. For example, the court in *Cavanaugh* rejected a hyperlink on a membership registration page that contained informational fields stacked vertically upon a "Create an Account," under which is a sentence stating, in gray, "[b]y signing up, you agree to our Terms of Use and Privacy Policy." 2024 WL 3202567 at *2, *5 (E.D. Cal. Jun. 26, 2024). Reviewing the "Create an Account" page reproduced therein, that hyperlink is more conspicuous in many characteristics:[2] the page is less cluttered, the font size is of more similar size to the general text, and the page layout is entirely vertical, drawing attention down a single line. Nevertheless, the court held this hyperlink was insufficiently conspicuous. *Id.* at *5. The Court finds this case analogous in transactional context, as the plaintiff in *Cavanaugh* encountered this hyperlink while making an account through which he would place at least six purchases, indicating the expectation of an ongoing relationship—at least regarding the *Cavanaugh* plaintiff's expectations at the "Create an Account" stage. *Id.* at *3. The *Cavanaugh* court later considered the fact that the plaintiff repeatedly used his account to make purchases on the defendant's website, at each instance encountering another hyperlinked terms and conditions. *Id.* at *7–8. *Colgate v. JUUL Labs, Inc.*, decided earlier, presents facts similar to *Cavanaugh*'s "Create an Account" page, with the same results. *See Colgate*, 402 F. Supp. 3d at 763–66.

The Court likewise notes differences between the facts here and cases from district courts in the Ninth Circuit in which courts found a hyperlink to terms and conditions sufficiently conspicuous. In these cases, unlike here, hyperlinks generally appear on simple, uncluttered webpages, in text of one sentence or little more, with few, if any,

---

[2] Though, the Court notes, not font color.

additional hyperlinks around them.  *See, e.g.*, *Nail v. Lens.com, Inc.*, No. 2:24-CV-02531-SB-E, 2024 WL 3723912 at *4 (C.D. Cal. Jun. 20, 2024); *Ghazizadeh*, 2024 WL 3455255 at *5–10, *14; *Pizarro v. QuinStreet, Inc.,* No. 22-CV-02803-MMC, 2022 WL 3357838 at *3 (N.D. Cal. Aug. 15, 2022) ("the general design of the webpage, which is comprised of only two data fields, is relatively uncluttered and has a muted, and essentially uniform, color scheme.").

Considering the entirety of the subscription page and the context of Plaintiff's relationship with Defendant, the hyperlink here did not sufficiently put Plaintiff on notice of the agreement—especially given the California state courts' tendency to shift the onus of creating clarity onto website creators. *See Sellers*, 289 Cal. Rptr. 3d 16–32.  Thus, the Court finds there is no enforceable arbitration agreement, and the Court need not examine subsidiary questions of arbitrability or whether, had such agreement existed, Defendant would have a right to enforce it.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's motion to compel arbitration.

**IT IS SO ORDERED**.

Dated:  October 31, 2024

HON. MICHAEL M. ANELLO
United States District Judge